IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 21, 2025 Session

**STATE OF TENNESSEE v. ASBEN K. CHAPMAN**

**Appeal from the Criminal Court for Davidson County**
**No. 2020-B-1240     Cheryl A. Blackburn, Judge**
_____

**No. M2023-01806-CCA-R3-CD**
_____


A Davidson County jury convicted the Defendant, Asben K. Chapman, of one count of first degree premeditated murder, two counts of felony murder, two counts of attempted first degree murder, and two counts of employing a firearm during a dangerous felony offense.  The trial court imposed an effective sentence of life plus thirty-one years in the Tennessee Department of Correction.  On appeal, the Defendant contends: (1) the trial court improperly admitted pretrial statements; (2) the evidence was insufficient to establish premeditation for his first degree murder conviction and attempted first degree murder convictions; and (3) the trial court improperly ordered consecutive sentences.  After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Manuel B. Russ, Nashville, Tennessee, for the appellant, Asben K. Chapman.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Megan M. King, and Madeline Grace Moore, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**


This case arises from the death of one person and injuries to three people following a car accident caused by the Defendant's gunfire.  The Defendant fired a gun at Ms. Devan Tucker's Chevrolet Cruz ("Chevy Cruz"), which was driven by Tronyesha Armstrong on

the night of March 10, 2018.  His pursuit and the gunfire caused Ms. Tucker's car to crash into another vehicle, killing one of the passengers, Robin Jenkins, and injuring her passenger and both occupants of the Chevy Cruz.  For the Defendant's role in these events, a Davidson County grand jury indicted the Defendant for one count of the first degree murder of Robin Jenkins, two counts of felony murder, two counts of the attempted first degree murder of Devan Tucker and Tronyesha Armstrong, and two counts of employment of a firearm during a dangerous felony offense.

At the Defendant's trial on these charges, the parties presented the following evidence: On the night of March 10, 2018, Tronyesha Armstrong and Ms. Tucker went to a store on Whites Creek Pike in Ms. Tucker's white Chevy Cruz.  Ms. Armstrong drove to the store and waited in the car while Ms. Tucker went inside.  While inside, Ms. Tucker saw a woman she recognized from social media, Latronnia Howard ("Latronnia")[1].  Ms. Tucker did not speak with Latronnia while in the market.  After exiting the market, Ms. Tucker noticed two cars had parked next to her Chevy Cruz.  Ms. Tucker got into the passenger side of her car, and Ms. Armstrong drove away.

As they drove down Knight Drive, headed home, Ms. Tucker noticed that the two cars she had seen at the store were following them and driving close to the Chevy Cruz. At one point, Ms. Tucker saw a gun held in the air.  She instructed Ms. Armstrong to drive faster to get away from the vehicles.  As she did so, one of the two cars moved into the oncoming lane of traffic, sped up next to the Chevy Cruz, and shot the driver's side window out.  Ms. Tucker heard gunfire but did not know if it came from one vehicle or both because she and Ms. Armstrong "ducked down" when the gunfire began.  The last thing Ms. Tucker recalled seeing before she "blacked out" was the driver's side window shatter.

First responders transported Ms. Tucker to Skyline Medical Center for treatment. The following day, Ms. Tucker spoke with a police officer at Skyline and told him that a black car pulled next to the driver's side window.  She described the two vehicles as "trying to box" them in.  Ms. Tucker was admitted to the hospital for a week for surgery related to her broken back.  After release from the hospital, Ms. Tucker required assistance to accomplish routine tasks such as dressing and bathing.  She experienced depression in the wake of this incident and needed a walker for mobility.  At the time of the trial, Ms. Tucker still required pain medication due to the effects of the car wreck.

Ms. Tucker knew the Defendant through social media.  Before the shooting, Ms. Tucker posted something on Facebook related to the Defendant's brother.  Ms. Tucker's

---

[1] Two witnesses share the last name.  For clarity, we will refer to each by their first name.  No disrespect is intended.

friend, Davonte Zieglar, was killed[2] on March 6, 2015. On the anniversary of his death, March 6, 2018, Ms. Tucker posted "This little dude killed my friend and [Ziegler] supposed to have been here." Ms. Tucker confirmed that the "little dude" was in reference to the Defendant's brother. Ms. Armstrong told Ms. Tucker to remove the post so Ms. Tucker deleted it.

The State played surveillance video footage from the store recorded on March 10, 2018. The video showed Ms. Tucker's Chevy Cruz, with the passenger door slightly ajar and Ms. Armstrong seated in the driver's seat. A dark-colored sedan parked next to the Chevy Cruz, and a man exited the vehicle and walked into the market. A gold BMW parked next to the dark-colored sedan. Ms. Tucker confirmed that it was the same dark-colored sedan and gold BMW that followed them. The video showed the Chevy Cruz leaving the market with the BMW and then the dark-colored sedan following.

Ms. Armstrong testified about the events of the evening consistent with Ms. Tucker's account. She added that after Ms. Tucker went inside the store, two cars pulled up and parked next to the Chevy Cruz. Ms. Armstrong saw Latronnia, whom she recognized from school, exit one of the cars. After leaving the market and turning onto Knight Road, Ms. Armstrong heard a gunshot, and Ms. Tucker said, "It's them, they shooting me down." Ms. Armstrong described what occurred next:

> Once that happened I was just trying to, you know, flee and run, you know, as fast as I could. . . . . The goldish car was behind us and, then, the sedan was on the side of us. And then they were just shooting the car all the way around. They didn't care. Just kept shooting. Kept shooting. Didn't care it was two females. Nothing. They just kept shooting, like, you know, they didn't care. They didn't care about my life. They didn't care about Devan's life. They wanted us dead.

Ms. Armstrong confirmed that occupants in both vehicles were firing on the Chevy Cruz. She was "[m]ost definitely positive" that the vehicles parked next to her at the store were the same vehicles firing on them. At some point, the dark-colored sedan moved into the oncoming lane of traffic, accelerated next to the Chevy Cruz, and shot out the driver's side window of the Chevy Cruz. Ms. Armstrong felt "block[ed]" in with the dark-colored sedan in the oncoming lane of traffic and the gold BMW behind her. Ms. Armstrong accelerated to seventy or eighty miles an hour to escape the two vehicles. Ultimately, Ms. Armstrong ran into a Honda Civic.

---

[2] The record indicates that Davonte Ziegler was killed by the Defendant's brother but that "it was ruled an accident."

Ms. Armstrong called 911, and first responders transported her to Vanderbilt University Medical Center. She broke her foot in the accident and her injuries required surgery to place rods, plates, and screws to repair her foot. She also sustained a puncture wound to her chest. Ms. Armstrong used a walker and crutches for mobility following her surgery. At the time of trial, she still experienced fear as a result of this event.

Ms. Armstrong knew the Defendant from school and identified him in the courtroom. Ms. Armstrong saw that the Defendant posted a derogatory comment in response to Ms. Tucker's March 6, 2018 Facebook post about Mr. Zeiglar's death. Consequently, Ms. Armstrong told Ms. Tucker to delete the post due to her concern about the Defendant's response.

Amiya Jenkins[3] and her mother, Robin Jenkins, were driving to a nearby store. Amiya and her mother were in a grey Honda Civic driving down Knight Drive when another car hit them. She had no recollection of the accident. Her first memory was of waking up in the hospital. As a result of the accident, Amiya broke the femur bone in both of her legs and fractured her hip bone. These injuries required two surgeries: one for her femurs and the other to address the hip fracture. Amiya was hospitalized for about a month and had to go to rehab to learn how to walk again. At the time of the accident, Amiya was a student but due to her injuries she did not return to school. While in the hospital, Amiya learned that her mother, Ms. Jenkins, had died as a result of her injuries. Amiya was unable to attend the funeral as she was hospitalized at the time.

Metro Nashville Police ("MNPD") Officer Pamela Caulder responded to the scene of the accident and secured the perimeter. She found a shell casing located just inside the headlights of her vehicle that was positioned across both lanes of traffic at the intersection of Knight Drive and White's Creek Pike. MNPD crime scene investigator Claire Vondohlen collected the forty-caliber cartridge casing on the northbound side of White's Creek Pike.

MNPD Officer Donald Davidson also responded to the fatal crash on Knight Drive. When he arrived at the crash scene, he observed two vehicles, a Honda Civic and a Chevy Cruz. Three of the four occupants of the vehicles had been transported to the hospital. Only Robin Jenkins, deceased, remained at the scene, seated in the driver's seat of the Honda Civic. It appeared that all four people involved in the accident had been wearing their seat belts.

---

[3] Because Amiya Jenkins and Robin Jenkins share the same last name, we will refer to Amiya Jenkins by her first name. We do so for purposes of clarity and intend no disrespect.

Officer Davidson mapped the scene based upon where the vehicles came to rest, scrapes, gouges, scratches on the pavement, and debris from the vehicles. Based on the investigation, Officer Davidson opined that the Chevy Cruz encroached into the southbound lane and struck the Civic head on in the southbound lane, pushing the Civic backward about fifty-three feet. Based upon the movement, Officer Davidson believed that the Chevy Cruz was moving at a high rate of speed at impact. Nothing from his investigation indicated that a third vehicle struck either car. He acknowledged that if a third car made a "glancing blow" it would be possible for a third vehicle to have been involved and not have left behind any physical evidence.

Outside the presence of the jury, the State announced its next witness was Mysjah Howard ("Mysjah"), Latronnia's cousin and an occupant in the gold BMW on the night of the shooting. According to the State, despite contrary prior statements to the police, Mysjah was going to testify that she had no memory of these events. The State sought to introduce an audio and video recording of two police interviews pursuant to Tennessee Rule of Evidence 803(26). The rule requires the State, outside the presence of the jury, to put on proof of the trustworthiness of the statement. The State noted that Latronnia also might refuse to answer questions, so the State sought to address both Mysjah and Latronnia's statements during the jury-out hearing in the event Latronnia also testified that she could not remember the events of the shooting. The trial court read Rule 803(26) aloud and then the State presented Detective Gary Shannon's testimony about the circumstances of the statements.

Detective Shannon interviewed Latronnia and Mysjah on March 13, 2018, at Latronnia's house on Wooddale Lane. Detective Shannon first interviewed Latronnia and he audio-recorded her statement. While speaking with Latronnia, Detective Shannon learned that Mysjah had been with Latronnia the night of the shooting. Mysjah also agreed to speak with the detective, and Detective Shannon audio-recorded the interview with Mysjah. At some point an unknown man approached the police car, creating a disturbance, so Detective Shannon asked Latronnia and Mysjah to speak with him at the police precinct and both agreed.

At the North Precinct, Detective Shannon interviewed Latronnia and Mysjah separately. Detective Stanley Truitt was present, and Detective Shannon video recorded the interviews. Latronnia and Mysjah repeatedly told Detective Shannon that they did not want their names associated with the investigation. Detective Shannon testified that neither Latronnia nor Mysjah showed any signs of impairment during the interviews. The information they provided was corroborated by the crime scene evidence and the market surveillance footage. Further, their statements were very similar to Ms. Tucker's and Ms. Armstrong's accounts of what had occurred that night.

- 5 -

The trial court, considering Rule 803, noted that the recording from Latronnia's residence was an audio recording as required by the rule and the recording from the precinct was a video recording. Next, the trial court found by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness. The trial court told the State that Latronnia and Mysjah would need to testify and, depending on their response to the State's questions, the State could introduce the recordings through Detective Shannon.

The trial resumed, and Mysjah and Latronnia both testified that they could not recall anything from the night of the shooting or the interviews with Detective Shannon. Both women confirmed their signatures on the photographic identification documents on which they identified the Defendant as the shooter. Latronnia identified herself in still photographs retrieved from the store surveillance recording. Mysjah attributed her lack of memory to her epilepsy diagnosis following her pregnancy in 2019. Upon questioning by the prosecutor, Latronnia attributed her lack of memory to drug use; however, when questioned by the defense attorney she attributed her memory loss to trauma over the past few years.

Detective Shannon testified about his role in the investigation. He interviewed Ms. Tucker at Skyline on March 11, 2018. Ms. Tucker's account of the night's events was consistent with her trial testimony. Detective Shannon also interviewed Ms. Armstrong on the same day at Ms. Armstrong's residence. Ms. Armstrong's statement to the detective was consistent with Ms. Tucker's statement. Ms. Armstrong identified Latronnia as the woman she saw exit one of the two suspect vehicles in the parking lot of the store. Based upon this information, Detective Shannon obtained the store's surveillance video recording.

The State played the surveillance video recording, and Detective Shannon identified Ms. Tucker exiting the Chevy Cruz and Ms. Armstrong in the driver's seat. Detective Shannon noted the dark-colored sedan followed by the gold BMW parking next to the Chevy Cruz. A man exited the dark-colored sedan, and Latronnia exited the gold BMW. The video showed Ms. Tucker exiting the store and getting into the Chevy Cruz and then Latronnia exiting the store. As she walked toward the BMW, the rear passenger door of the gold BMW opened, and Detective Shannon identified Mysjah in the video. The video showed the Chevy Cruz turning left out of the parking lot and the dark-colored sedan and gold BMW following. Although the driver of the BMW cannot be identified, the video showed that there was no one seated in the front passenger seat.

On March 13, 2018, Detective Shannon spoke with Latronnia at her residence located on Wooddale Lane. Inside the residence, Latronnia's mother and Mysjah were present. Latronnia agreed to speak with Detective Shannon in his car independent of other

people in her home.  Based upon Latronnia and Mysjah's testimony that they did not recall any of the events of the night of the shooting or speaking with Detective Shannon, the State offered the recordings of the interviews.  Before playing the audio interview for the jury, the trial court instructed the jury as follows:

> Ladies and gentlemen, you are going to be hearing audio recordings -- this is Latronnia Howard -- which were made prior to their testimony in this case.  If you find the content of the statement inconsistent with their testimony, you may consider the statements made outside your presence by this individual as substantive evidence of the truth of the matter asserted in such statements made outside your presence.  And I will give you a lengthier instruction about that.

> Also, ladies and gentlemen, you may be hearing statements that are going to be made by the detective.  The statements of the detective are not considered for the truth of the matter.  It's just to consider the statements made by, in this particular case, Latronnia Howard.

The State played the audio recording of Detective Shannon's interview with Latronnia in his car.  In the audio recording, Detective Shannon asked Latronnia about a still photograph from the store, and Latronnia confirmed that she was in the photograph wearing a pink jacket.  Latronnia told Detective Shannon that she was at the store with her cousin, Mysjah.  She recalled that they were walking to the store to buy a drink when "some people" recognized her from Facebook and offered her a ride.  Initially she said that she rode to the store in the dark-colored sedan, but later admitted it was the gold BMW.  After she purchased her drink at the store, the driver of the gold BMW dropped her off at a daycare, and she walked home.

In the audio recording, Latronnia denied knowing the names of anyone in either vehicle.  She said there were two men in the front seat of the gold BMW and she and Mysjah sat in the back seat.  Latronnia maintained that the men dropped her and Mysjah off at the daycare.  When Detective Shannon told her he would obtain the surveillance video footage from the daycare, she responded, "They didn't pull into nowhere."  She asked Detective Shannon if she disclosed the name of the driver, would Detective Shannon remove her name from the investigation.  She stated that she did not know what prompted the shooting.  Latronnia recalled that Mysjah was seated behind the driver's seat but when Latronnia returned to the car after buying her drink, Mysjah moved to the seat behind the front passenger seat.  Latronnia said the front passenger was firing a handgun and that he went by "Lil Reggie."  She said the driver of the gold BMW went by "Woody."  She denied knowing either of the passengers in the Chevy Cruz.  When questioned about the location of the dark-colored sedan and whether occupants in that car were shooting, she said she

did not know because she had been high at the time.  Latronnia said that after the shooting, she arranged to have her sister pick her up from a location close to her home.  Latronnia maintained that she did not know why the people in the gold BMW were shooting at the Chevy Cruz.

After learning that Mysjah had been in the gold BMW, Detective Shannon spoke with Mysjah in his car.  Mysjah expressed concern about her name being on any paperwork.  Mysjah told Detective Shannon that they were "supposed to go to the store and go back to the house."  She stated that they were "somewhere out North" when they got into the gold BMW.  The man driving the car was called "Suu-Wootie," later identified as the Defendant.  At the store they parked next to the Chevy Cruz.  The Defendant was angry about something one of the women in the Chevy Cruz had posted on Facebook about his brother.  When Latronnia exited the store, the Defendant urged the women to get in the car quickly because the Chevy Cruz was leaving.

Detective Shannon testified that, at this point, Mysjah and Latronnia were transported to the police station for further questioning.  Detective Truitt and Detective Shannon interviewed both women separately, and video recorded the interviews.  In the video recording, Latronnia expressed concern about her name being on any "paper" associated with the investigation.  She agreed to speak with the officers, but she maintained that she did not want her name on the "paperwork."  She told the officers that the Defendant was driving the gold BMW, but she could provide them only his street name.  She told the officers that the Defendant did not have a permanent residence, he stayed "place to place."  Contrary to her earlier statement, Latronnia said that no one was in the front passenger seat of the gold BMW.  She confirmed that there were only three people in the gold BMW at the time of the shooting: the Defendant, Latronnia, and Mysjah.

Latronnia told the officers that the Defendant drove her to the store where she bought a drink.  When she exited the store, "they" told her to hurry up and get in the car.  The Defendant followed the Chevy Cruz, and "they" began firing at the Chevy Cruz.  The dark-colored sedan drove around the gold BMW and fired at the side of the Chevy Cruz.  According to Latronnia, the dark-colored sedan hit Ms. Jenkins's car, but the dark-colored sedan drove away from the accident.

Latronnia told the officers that "Brazy" drove the dark-colored sedan and "Lil Red" was in the car with him.  When asked about "Lil Reggie," Latronnia said that "Lil Reggie" was the "other dude."  She then qualified that she was unsure if the man's name was "Lil Reggie" as she did not know him well.  Latronnia said the fourth person in the dark-colored sedan was a female.  She confirmed that the Defendant fired a gun at the Chevy Cruz from the gold BMW.  She did not know who was shooting from the dark-colored sedan, but she thought the gunfire came from the back seat.  After the accident, they stopped at an

apartment complex "out west" before going to the Skyview apartments where Latronnia's sister picked her up and drove Latronnia and Mysjah to her sister's boyfriend's house in Antioch.

When asked about whether the Defendant told her why he fired his gun at the Chevy Cruz, Latronnia recalled that the Defendant said that it had something to do with his younger brother and the 2015 shooting death of Devante Ziegler.

Detective Shannon then spoke with Mysjah. Mysjah said that initially there were two men in the gold BMW with "Suu-Wootie," who she later identified as the Defendant. A man, "Brazy," drove the dark-colored sedan and a woman, "Tuncca," was with him. Before they drove to the store, the two men who had been in the gold BMW moved to the back seat of the dark-colored sedan. Mysjah and Latronnia rode in the back seat of the gold BMW with the Defendant driving. At the store, the Defendant pointed out the women in the Chevy Cruz, indicating that one of the women had said disparaging things about his brother. The Defendant wanted to follow the Chevy Cruz, but Mysjah told him to take her home first. Despite her request, the Defendant pursued the Chevy Cruz and began firing a gun at the car. "Brazy," driving the dark-colored sedan, pulled into the oncoming lane of traffic and sped up next to the Chevy Cruz, firing a gun at the side of the Chevy Cruz. As this was happening, a car in the oncoming lane of traffic approached and a car accident ensued. The Defendant drove away from the accident at a high rate of speed. Latronnia and Mysjah asked him to slow down but he refused, insisting that he had to "get away" and get more ammunition. The Defendant drove to a grey apartment building.

At the apartment complex, "Brazy" got in the gold BMW, and they left the dark-colored sedan behind. "Brazy" and the Defendant decided to play "laser tag." Mysjah explained that this meant shooting at deer from the car. The Defendant drove to a grassy area to look for deer. While at the grassy area, Mysjah used her cell phone to arrange for someone to pick her up. As she was explaining her location, "Brazy" took Mysjah's phone and threw it out the window. In contrast to Latronnia's version of the events, Mysjah told the officers that the Defendant drove Latronnia and Mysjah to Latronnia's house. It was not until the next morning that Mysjah learned about the death and injuries that resulted from the car wreck. Mysjah detailed for Detective Shannon the specific route the Defendant took to drive them to Latronnia's house that night after the shooting.

At Detective Shannon's request, Mysjah identified herself in the surveillance footage from the store. She told him that the people in the suspect cars were Latronnia's friends but that she had met the Defendant about a week before the shooting. She recalled that the Defendant had fired a gray and black pistol at the Chevy Cruz. In the dark-colored sedan, she thought "Brazy," and one other man were the shooters, but she was unsure due to the tinted windows.

- 9 -

After playing the recordings for the jury, Detective Shannon stated that, during his investigation, he was unable to positively identify any of the people in the dark-colored sedan. He was able to confirm that the Defendant's street name was "Suu-Wootie."[4] Additionally, Detective Shannon was familiar with the shooting death of Mr. Zeiglar that involved the Defendant's younger brother referenced by both Latronnia and Mysjah during their interviews. Detective Shannon created a photographic lineup including a photograph of the Defendant. Both Latronnia and Mysjah identified the Defendant as "Suu-Wootie," and the driver of the gold BMW.

As part of his investigation, Detective Shannon reviewed recorded telephone calls involving the Defendant during his incarceration. In three separate phone calls, the Defendant referred to himself as "Suu-Wootie."

MNPD Detective Gish extracted data from Latronnia's cell phone and sorted the data to focus on communication between Latronnia's phone and a phone contact, "Suuwxxdy" and Facebook messages and calls between Latronnia and a "SuWoody" Facebook account. Detective Gish found several Facebook calls between Latronnia and the "SuWoody" Facebook account on March 9. On March 10, the day of the shooting, at 11:36 p.m., Latronnia missed a Facebook call from "SuWoody." A minute later, she returned the call, and the two parties engaged in a phone call that lasted one minute and thirty-two seconds. Less than an hour later, at 12:54 a.m., Latronnia received a fourteen second incoming Facebook call from "SuWoody." At 1:28 a.m., Latronnia received a one minute and ten second Facebook call from "SuWoody." Around this time, Latronnia and "SuWoody" exchanged three more phone and Facebook calls. Detective Gish's report reflects that phone communication between Latronnia and "SuWoody" continued throughout the morning of March 11, 2018, and several more on March 12, 2018. Detective Gish noted that some of the phone calls between Latronnia and "SuWoody" had been deleted.

Detective Gish also found an IMessage March 12, 2018 conversation mentioning Ms. Armstrong. The conversation involved Latronnia, Mysjah, and an unidentified number. A message was sent from Latronnia's cell phone to the others, instructing Mysjah to "[s]creenshot everything" on Ms. Armstrong's Facebook page.

MNPD Detective Steven Jones processed Ms. Tucker's Chevy Cruz. He observed eleven bullet defects on the car's exterior. Detective Jones recovered a bullet from inside a bullet defect on the front passenger door along the window trim and two bullets from

---

[4] The transcript reflects the Defendant's street name as "SuuWoody" and "Suu-Wootie." For consistency, when summarizing the transcript we will use "Suu-Wootie."

inside of the trunk. One was found on the floor of the trunk, underneath the carpeted cover of the trunk and the other in the spare tire area that sits below the trunk.

The day after the shooting, March 12, 2018, MNPD Officer Benjamin Cantrell located a vehicle reported stolen at an apartment complex located on Maudina Avenue in West Nashville. The vehicle was a "goldish" BMW. The car was locked and there appeared to be a bullet hole in the hood of the car. Based upon the defect, it appeared that the weapon was fired "closer" to the vehicle, perhaps even fired from inside the vehicle. MNPD Detective Belcher collected fingerprints from the gold BMW from the doors of the vehicle; however, subsequent fingerprint analysis did not reveal enough characteristics in the prints to determine identification or exclusion with an individual.

Hendersonville Police Department Sergeant Jacob Sprouls spoke, for reasons unrelated to this case, to the occupants of an apartment on Maudina Avenue. Sergeant Sprouls asked the resident for permission to search for evidence related to the case he was working on, and the resident gave consent after telling Sergeant Sprouls that no one else was inside the apartment. When Sergeant Sprouls attempted to open the door, he found that the door had been chained from the inside, indicating there was someone inside the apartment. Sergeant Sprouls "gave verbal commands several times for the occupants to come out." Within a few minutes, the Defendant and Cedric Odom exited the apartment. A search of the apartment revealed three handguns: (1) a Smith and Wesson forty caliber semi-automatic pistol; (2) a Cobra three-eighty caliber semi-automatic pistol; and (3) a Taurus nine-millimeter pistol. Sergeant Sprouls also found a backpack inside the apartment that contained the Defendant's driver's license and a plastic bag of ammunition. Officers found loaded magazines for the guns in addition to a variety of ammunition in the apartment.

MNPD Officer Don Carman examined the weapons Sergeant Sprouls collected from the apartment, the cartridge case recovered at the scene, and the bullets recovered from the Chevy Cruz. His inspection revealed that the cartridge case was fired from the Smith and Wesson forty caliber semi-automatic pistol. One of the bullets found in the Chevy Cruz was consistent with having been fired from the Smith and Wesson pistol; however, Officer Carmen explained that although the bullet was consistent, he could not say for certain it was fired from the Smith and Wesson pistol. The other two bullets recovered from the Chevy Cruz were consistent with having been fired from the Taurus pistol.

Davidson County Medical Examiner Emily Dennison did not conduct the autopsy but was present during it. She confirmed the medical conclusions that Ms. Jenkins died as a result of multiple blunt force injuries and that the manner of death was car accident. Ms. Jenkins sustained numerous injuries with several fatal injuries, including lacerations to the

liver, blood in the chest cavity and the sack that surrounded the heart, a transection of the spinal cord in her neck and fractures to the pelvis.

The Defendant called Kathy Chambers, an investigator, to testify on his behalf. Ms. Chambers spoke with Latronnia on December 3, 2021. Latronnia told Ms. Chambers that she had no memory of who she was with on the night of the shooting but "just tossed out a bunch of names to that detective because she was scared." Latronnia told Ms. Chambers that she mentioned the Defendant's name because he was the last person she saw earlier that day "before her pill kicked in."

Ms. Chambers also spoke with Mysjah. Mysjah said that she was talking with "the homeboy" in the backseat of a car but could not recall which car. She recalled that a blue car was involved but did not know which car the gunshots came from. Mysjah told Ms. Chambers that she was in a car with "boys" and a car pulled up next to them with "girls [who] were talking s**t."

After hearing this evidence, the jury convicted the Defendant of one count of first degree murder, two counts of felony murder, two counts of attempted first degree murder and two counts of employing a firearm during a dangerous felony offense. The trial court merged the felony murder convictions into the first degree murder conviction and imposed a life sentence. Next, the trial court imposed concurrent twenty-five year sentences for each of the attempted first degree murder convictions and six-year concurrent sentences for each of the employment of a firearm during a dangerous felony offense convictions. The trial court then ordered that the attempted murder sentences would run consecutively to the life sentence and the employment of a firearm sentences would run consecutively to the attempted murder sentences for an effective sentence of life plus thirty-one years. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that: (1) the trial court improperly admitted the pretrial statements of Latronnia and Mysjah; (2) the evidence is insufficient to establish premeditation for the attempted first degree murder convictions and the first degree murder conviction; and (3) the trial court improperly imposed consecutive sentencing. The State asks us to affirm the trial court in all respects.

### A. Admission of Pretrial Statements

The Defendant asserts that the trial court erred by admitting Latronnia's and Mysjah's statements to law enforcement. The State responds that the trial court properly

admitted the statements as substantive evidence pursuant to Tennessee Rule of Evidence 803(26). We agree with the State.

Tennessee Rule of Evidence 803(26) provides that a prior inconsistent statement that is otherwise admissible under Rule 613(b) is admissible as substantive evidence if the following prerequisites are met:

> (A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.
>
> (B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.
>
> (C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

This rule has been interpreted to apply when a testifying witness claims a lack of memory, as Latronnia and Mysjah did in the present case. *State v. Davis*, 466 S.W.3d 49, 64 (Tenn. 2015). Additionally:

> [Tennessee Rule of Evidence 803](26) alters Tennessee law by permitting some prior inconsistent statements to be treated as substantive evidence. Many other jurisdictions have adopted this approach to address circumstances where witnesses suddenly claim a lack of memory in light of external threats of violence which cannot be directly attributed to a party, for example. This rule incorporates several safeguards to assure that the prior inconsistent statements are both reliable and authentic.
>
> To be considered as substantive evidence the statement must first meet the traditional conditions of admissibility which include the procedural aspects of inconsistent statements as addressed in Rule 613. This reference also makes clear that only prior inconsistent statements, and not consistent statements, are within the ambit of this rule.

*State v. Davis*, 466 S.W.3d 49 (Tenn. 2015) (citing Tenn. R. Evid. 803(26) Advisory Commission Cmt. (2009)).

Tennessee Rule of Evidence 613(b) permits the use of extrinsic evidence of prior inconsistent statements for the purpose of impeachment. The Rule provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless

- 13 -

and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."..The "factual and credibility findings" made by the trial court when considering whether a statement is hearsay "are binding on a reviewing court unless the evidence in the record preponderates against them." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). "Once the trial court has made its factual findings, the next questions— whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule—are questions of law subject to *de novo* review." *Kendrick*, 454 S.W.3d at 479 (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007)). "If a hearsay statement does fit under one of the exceptions, the trial court may not use the hearsay rule to suppress the statement." *Kendrick*, 454 S.W.3d at 479.

Here, the State intended to call Latronnia and Mysjah as witnesses but believed that they would deny any memory of the March 10, 2018 shooting. Their denial was inconsistent with their earlier statements to the police. The Defendant was given the opportunity to cross-examine both witnesses. The statements the State sought to introduce were from an audio recording of the interviews at Latronnia's house and video recordings of the interviews at the police precinct. In these interviews, Latronnia and Mysjah provide detailed accounts of the events on the night of these alleged crimes. During the police interviews, both women expressed concern about their names being associated with the investigation. Their accounts of the shooting are consistent with the crime scene evidence, and Ms. Tucker and Ms. Armstrong's statements about the shooting. Detective Shannon testified that neither Latronnia nor Mysjah appeared to be under the influence of an intoxicant during the interviews. The trial court held a hearing outside the presence of the jury and found, by a preponderance of the evidence, that the prior statements were made under circumstances indicating trustworthiness.

The trial court concluded that, depending on Latronnia's and Mysjah's testimony at trial, their interviews were admissible pursuant to Tennessee Rule of Evidence 803(26). The State called Latronnia and then Mysjah to testify. Both women testified that they had no memory of the March 10, 2018 shooting or of their statements to Detective Shannon on March 13, 2018. Both Latronnia and Mysjah identified their signatures on the photographic lineups identifying the Defendant as the driver of the gold BMW and one of the shooters. Based upon this testimony, the State called Detective Shannon to introduce the recordings.

The evidence does not preponderate against the trial court's credibility determination that Latronnia and Myjah were not being untruthful at trial but gave a truthful statement to Detective Shannon. The trial court followed the proper procedure for determining admissibility of the prior statements and, after a jury-out hearing, found the prior statements were made under circumstances indicating trustworthiness. Accordingly,

the statements were properly admitted, as substantive evidence, as a prior inconsistent statement pursuant to a proper hearsay exclusion exception. The Defendant is not entitled to relief on this issue.

To the extent that the Defendant now asserts that the State improperly called Latronnia and Mysjah "for the express purpose of then impeaching them with the more factually favorable pretrial statement," the issue is waived. As the State correctly notes, the Defendant never objected to the State calling Latronnia and Mysjah for the sole purpose of impeaching their testimony. Nor does the Defendant raise this challenge in his motion for new trial. The Defendant's first time raising the issue related to impeachment is on appeal. "[A] party is bound by the grounds asserted when making an objection. The party cannot assert a new or different theory to support the objection in the motion for a new trial or in the appellate court." *State v. Adkisson*, 899 S.W.2d 626, 634–635 (Tenn.Crim.App.1994); *see State v. Aucoin*, 756 S.W.2d 705, 715 (Tenn.Crim.App.1988) (holding that an appellant cannot object on one ground and assert a new basis on appeal); *see also State v. David Dwayne Smith*, No. E2007-00084-CCA-R3-CD, 2009 WL 230696, at \*21 (Tenn. Crim. App. Feb. 2, 2009), *perm. app. denied* (Tenn. Aug. 17, 2009). When that happens, the party waives the issue. *See Adkisson*, 899 S.W.2d at 635.

## B. Sufficiency of the Evidence

The Defendant argues that the State did not prove that the Defendant acted with premeditation as to his convictions for the first degree premeditated murder of Robin Jenkins, the attempted first degree murder of Devan Tucker, and the attempted first degree murder of Tronyesha Armstrong. He further argues that, because the State failed to provide sufficient evidence to support the convictions for attempted first degree murder, both felony murder convictions lack sufficient evidence as well. The State responds that the evidence showing that the Defendant pursued the Chevy Cruz while firing at the car until it crashed is sufficient evidence for the jury to reasonably infer premeditation. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct

evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

In his brief, the Defendant challenges only three of his convictions. He challenges the sufficiency of the evidence for his conviction for the first degree premeditated murder of Ms. Jenkins and the two counts of attempted first degree murder of Ms. Tucker and Ms. Armstrong, respectively. As such, we address only these three convictions.

## 1. Attempted First Degree Murder of Ms. Tucker and Ms. Armstrong

The Defendant argues that there was insufficient evidence to prove that he acted with premeditation. He argues that because the State failed to show premeditation to support his attempted first degree murder convictions that there is insufficient evidence to prove the felony murder convictions. The State responds that there was sufficient evidence upon which the jury could reasonably infer premeditation.

First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2018). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2018). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d) (2018).

The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

"A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or . . . acts with the intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the

commission of the offense" T.C.A. § 39-12-101(a)(2)-(3) (2018). To constitute a substantial step, a person's entire course of action must be corroborative of the intent to commit the offense. T.C.A. § 39-12-101(b) (2018).

The evidence, viewed in the light most favorable to the State, showed that Ms. Tucker posted on Facebook about the Defendant's brother and that the post angered the Defendant. Several days later, the Defendant and Ms. Tucker both parked their vehicles outside the same store. The Defendant saw Ms. Tucker and identified her to Latronnia and Mysjah as the person who posted on Facebook about his brother. When Ms. Tucker exited the store and drove away, the Defendant urged Latronnia to get in the gold BMW quickly so he could follow Ms. Tucker's Chevy Cruz. The Defendant followed the Chevy Cruz closely and began firing at the Chevy Cruz, causing Ms. Armstrong, the driver of the Chevy Cruz to accelerate. With the Defendant following closely behind, the dark-colored sedan moved into the oncoming lane of traffic and accelerated until it was next to the Chevy Cruz and began firing at the driver's side window. Taking up both lanes, the cars sped down Knight Road until eventually hitting a vehicle in the oncoming lane of traffic. The Defendant and the dark-colored sedan drove away from the scene of the accident. As they fled the scene, Latronnia and Mysjah urged the Defendant to slow down but he refused, maintaining that he needed to "get away" and obtain more ammunition. After stopping at an apartment complex, "Brazy," the driver of the dark-colored sedan, joined them in the BMW and the group went to a field to shoot at deer.

This evidence supports the jury's finding of premeditation. The use of a deadly weapon on unarmed victims, calmness following the murder, and motive for retaliation were all factors the jury could consider in finding that the Defendant attempted to kill Ms. Tucker and Ms. Armstrong with premeditation. The Defendant urges us to replace the jury's finding of premeditation with the theory that the Defendant acted under the influence of excitement and passion because he was "enraged by the prior insults to his brother." Thus, he was not "sufficiently free from excitement and passion." T.C.A. § 39-13-202(e). The Defendant's anger at the Facebook post, however, does not negate his ability to form premeditation or outweigh all the evidence supporting the jury's convictions for attempted first degree murder. The Defendant is not entitled to relief as to this issue.

The Defendant mentions in his brief that if this Court finds that the State failed to prove that he acted with premeditation with respect to the attempted first degree murder convictions then there is no basis for the felony murder charges. Based upon our conclusion that the evidence is sufficient to support the jury's findings of premeditated murder there is, likewise, sufficient evidence to support the felony murder convictions.

**2. First Degree Premeditated Murder of Robin Jenkins**

- 18 -

The Defendant argues that Ms. Jenkins death was "the result of a traffic accident," and, therefore, does not demonstrate that he caused her death with premeditation.

In this case, because the Defendant's conduct supported the jury's finding that he intended to kill Ms. Tucker and Ms. Armstrong, the element of intent as it applies to Ms. Jenkins is met. In *Millen v. State*, 988 S.W.2d 164, 164-66 (Tenn. 1999), the defendant intentionally fired a gun at a specific person but inadvertently killed a random victim. Our supreme court determined that the Tennessee murder statute, Tennessee Code Annotated section 39-13-202, did not limit its application to the intended victim, but incorporated the doctrine of "transferred intent" to allow application to any victim if the intent existed to murder a specific person. The court stated that the common law history of "transferred intent" has little application under our modern statutory law. *Id.* at 167. The court concluded that if a defendant has the intent to kill an intended victim and an innocent bystander is killed, the element of intent will be satisfied. *Id.* at 168.

Accordingly, even though the Defendant did not intend to kill Ms. Jenkins, the jury could still conclude that the Defendant was guilty of her murder because of his intent to kill Ms. Tucker. The Defendant is not entitled to relief.

### C. Consecutive Sentencing

The Defendant contends that the trial court erred by imposing consecutive sentencing. He asserts that the trial court failed to find "aggravating circumstances" to support its finding that he is a dangerous offender. The State responds that the trial court made the requisite *Wilkerson* findings and was not required to make additional findings. We agree with the State.

At the sentencing hearing, the trial court considered various factors in determining the alignment of the sentences. The trial court made the following findings as to the dangerous offender factor:

> "A dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the [risk to] human life is high." The court will find that that is a factor because of everything that we heard in the trial, what was happening about following people, shooting at their car, and forcing them off the road.
>
> . . . .
>
> Now, but I have to go further. I can't just do that. I have to consider whether or not it … reasonably relates to the severity of the offenses and whether it

- 19 -

is necessary in order to protect the public from further serious criminal conduct by the defendant. And I do find that that is what we have heard. It [is] an extremely severe sentence . . . but . . . he has a long history of [ ] violen[ce]. Aggravated Burglary. We have Handgun Possession. We have Aggravated Robbery. . . three counts of Aggravated Assault . . . all those were felonies of violent nature, and it is necessary in order to protect the public from further serious conduct by the defendant.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Acts purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2019); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

In *State v. Bise*, the Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" 380 S.W.3d 682, 708 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001); *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. In other words, so long as the trial court sentences a defendant within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id*. at 707.

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. T.C.A. § 40-35-115 (2019). The criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. *See id.; State v. Brannigan*, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *19 (Tenn. Crim. App. June 13, 2012), *no perm. app. filed*. The imposition of consecutive sentencing, however, is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" T.C.A. § 40-35-103(2), (4) (2019). We

review a trial court's decision to impose consecutive sentences for an abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432S.W.3rd 851, 860 (Tenn. 2013).

In this case, the trial court imposed consecutive sentencing upon finding that the appellant was "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(5) (2019). Our case law clearly reflects that in order to impose consecutive sentencing based upon finding that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and [that] (2) 'the terms are reasonably related to the severity of the offenses.'" *State v. Moore*, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting *Wilkerson*, 905 S.W.2d at 938); *see also State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

We conclude that the trial court addressed the *Wilkerson* factors and found consecutive sentencing was necessary to protect the public from the Defendant's further misconduct and that consecutive sentencing reasonably related to the severity and the seriousness of the offenses. Specifically, the trial court was troubled by the Defendant's repeated involvement in violent crimes and by the fact that the Defendant chased down the victims while repeatedly firing a weapon in a public place, placing unrelated people in harm's way. Therefore, we conclude that the trial court did not abuse its discretion by ordering consecutive sentencing.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE

- 21 -